This court therefore is of the opinion that the mere fact that Section 1 of Ordinance No. 397 of the village of Leipsic provides that fine of not more than $100 may be imposed and Section 3665 of the General Code of Ohio provides that the fine shall in no case exceed $50 does not invalidate the ordinance of the village of Leipsic.

The finding and judgment of the court of common pleas reversing the mayor's court of the village of Leipsic will be reversed and the finding and judgment of the mayor's court of the village of Leipsic will be affirmed, and the cause remanded for execution.

*Judgment reversed and cause remanded.*

JUSTICE, P. J., and CROW, J., concur.

THE LINDNER Co. *v.* THE MYROD SHOE Co. ET AL.

(Decided December 1, 1930.)

*Messrs. Thompson, Hine & Flory,* for plaintiff.
*Messrs. Newcomb, Newcomb & Nord* and *Messrs. Stanley, Horwitz & Kiefer,* for defendants.

LEVINE, J.   This case comes into this court on appeal from the decision of the common pleas court. The plaintiff seeks injunctive relief to restrain the defendants from using a certain trademark known as "Myrod," and from using the corporate name the "Myrod Shoe Company," in connection with their shoe business, upon these two grounds:

(a)   To prevent the violation of a written contract granting to plaintiff the continued and exclusive future use of a certain trade name known as "Myrod."

(b)   To prevent unfair competition.

The defendants, Thomas W. Meredith and the

Myrod Shoe Company, set forth various defenses. We shall, for our purpose, consider but two of these defenses: (a) That the provisions of the lease which provide for the transfer to the plaintiff of defendants' exclusive trade-name are invalid because plaintiff possesses no part of the good will of the business, and no part thereof has been transferred to it; (b) that the plaintiff is not entitled to the relief which it seeks because the lease provides that the defendants shall evidence the assignment or license of the trade-name by a paper writing in such form as is customary for the granting of the rights and use of trade-marks, which has not as yet been done.

In the defendants' cross-petition affirmative relief is sought against the Lindner Company, to enjoin it from the use of the trade-name known as "Myrod."

There is another defense interposed which attacks the good faith of plaintiff, the Lindner Company, and its officers, in that the plaintiff negotiated with a stockholder and officer of the defendant corporation for his services, beginning at the expiration of the lease, and therefore the plaintiff does not come into a court of equity with clean hands. We shall eliminate this defense of inequitable conduct on the part of the plaintiff in our consideration of this case, for reasons which we shall state hereinafter.

Much time and effort was expended by both sides in the preparation of a voluminous record dealing with certain phases of the evidence. We are of the opinion, however, that for the purposes of the issues raised by the two defenses above stated, which constitute our sole consideration, there is hardly any dispute.

The issues raised by the two defenses under consideration go entirely to the interpretation of a certain clause incorporated in a lease from the Lindner Company to Meredith and Bender, which, by consent of the parties, inured to the benefit of the Myrod Shoe Company organized under the laws of the state of Ohio after the execution of the lease from the Lindner Company to Meredith and Bender took place. This lease was executed for a period of five years and ran from September 1, 1925, to August 31, 1930. It contained no renewal clause.

Article 1 of the lease, in express terms, grants to the lessee the privilege of assigning the lease to a corporation to be formed by the lessee. In 1926, pursuant to the privilege granted to the lessee, the lease was assigned to the defendant the Myrod Shoe Company, an Ohio corporation, which had been organized by Meredith and Bender.

It will be observed that the corporate name contains the trade-mark name, which had theretofore been adopted by Meredith, and used by him in connection with his shoe business for many years. The trade-mark "Myrod" was created and adopted by Meredith in 1914, and in the same year the United States Patent Office registered in the name of defendant Thomas W. Meredith the trade-mark "Myrod" for use on boots, shoes, etc.

Meredith did not manufacture the shoes he sold, nor did he purchase all of the shoes from one manufacturer. The evidence shows that he purchased shoes wholesale from several manufacturers, and caused the manufacturers to place upon the shoes so purchased by him the trade-mark "Myrod." In some instances he specified combinations of colors,

location of buckles and straps, colors of ties, and some other details.

In the course of years the shoes sold bearing the trade-mark "Myrod" became well and favorably known to the shoe buying public, and a large and profitable business was built up. The rental paid by the Myrod Shoe Company to the Lindner Company was based upon a certain percentage of the gross sales. The particular portion of the lease from the Lindner Company to the Myrod Shoe Company which requires interpretation, and which constitutes the main controversy between the parties, is Article 19, which is as follows:

"Nineteen: In case of the termination of this lease for any reason, the Lessor shall have the exclusive privilege and right for Cleveland and Cuyahoga County to use a trade-mark 'Myrod' which the lessee will have established by using same on all footwear which it sells in the department, this privilege to be granted to the lessor by the lessee in such form as is customary, for the granting of rights in the use of trade-marks, upon lessor's agreeing to pay a royalty of one and half percent (1½) on the total net shoe business done in the department by the lessor in each year, not including any shoes which may be sold in any basement shoe department which may be established or maintained in addition to the shoe department herein described and referred to, and in which basement shoe department no shoes bearing the trade-mark 'Myrod' shall be sold. If the lessor so elects to use the said trade-mark, it shall have the right to continue the use of same and shall pay royalties on sales hereunder only as long as two-thirds (2/3) of its total annual sales, outside of any made

in any such basement shoe department, shall bear the said trade-mark or until three months after Lessor discontinues to purchase any shoes bearing such trade-mark. Settlement for said royalties to be made on the first days of September and March in each year and for the net shoe business done in the department by the Lessor except as aforesaid during the preceding six months period, and due payment for said royalties shall be made upon demand to the Lessee, or its order, or assigns, as may from time to time be directed in writing.

"In case the Lessor does not exercise its privilege and right to use the trade-mark 'Myrod' and also in case the Lessor, after electing to use said trade-mark 'Myrod' decides at any time to discontinue the use thereof, the Lessee hereby covenants in behalf of itself, its successors and assigns, that it will not use said trade-mark, nor will it grant the privilege of using said trade-mark, nor will it permit the use of said trade-mark in connection with the sale of any shoes sold in Cleveland or Cuyahoga County, in any department store or in any store selling men's or women's clothing; it being the intention of the parties that the Lessee may, in such event, sell or authorize the sale of shoes, bearing the trade-mark 'Myrod' in Cleveland and Cuyahoga County, in a retail shoe store, but not in any department store or in any store selling men's or women's clothing."

It may be taken as conceded that both parties complied with all the terms of the lease during the time which it covered. On or about June 21, 1930, the plaintiff notified the defendants, the Myrod Shoe Company and Meredith, that it desired and intended to use the trade-mark name and brand "Myrod"

on and after September 1, 1930. On or about June 27, 1930, the defendants, Meredith and the Myrod Shoe Company, notified the plaintiff in writing that they did not recognize any right of the plaintiff to the use of the trade name "Myrod," and that if any attempt was made by the plaintiff to use said name the defendants would take action to prevent such use. On July 21, 1930, the defendants, the Myrod Shoe Company and Meredith, notified the plaintiff that they did not regard the provisions in the lease with respect to the use of the trade-mark as binding upon them and that they intended on and after September 1, 1930, to establish a business elsewhere in the city of Cleveland, and to use in connection with the conduct of the business the trade-mark "Myrod," and to prosecute such business by and in the name of the Myrod Shoe Company.

The defendant the Myrod Shoe Company is now conducting a store for the sale of shoes at another location on Euclid avenue. During the pendency of this action it was permitted by this court to use the trade-name "Myrod" in connection with the sale of a certain stock of shoes which it took over from the premises of the Lindner Company.

Murray Bender, who for many years was connected with the Meredith and the Myrod Shoe Company, as general manager of its shoe business, is now employed by the Lindner Company as general manager of the shoe business which the Lindner Company conducts in its Euclid avenue store. It is conceded that since July 1, 1930, Bender has had no connection with the shoe business conducted by Meredith or by the Myrod Shoe Company, except

that he retains a stock interest of about 40 per cent in the Myrod Shoe Company.

Our attention is directed to the first portion of Article 19 of the lease, which reads:

"In case of the termination of this lease for any reason, the Lessor shall have the exclusive privilege and right for Cleveland and Cuyahoga County to use a trade-mark 'Myrod' which the lessee will have established by using same on all footwear which it sells in the department, this privilege to be granted to the lessor by the lessee in such form as is customary, for the granting of rights in the use of trade-marks, upon lessor's agreeing to pay a royalty * * * ,"

Counsel for the defendants point out that nowhere in the lease is there any agreement by the lessees to sell the shoe business, or the good will thereof, to the Lindner Company at the expiration of the lease; that nowhere in the lease is there any agreement by the lessees not to engage in retail shoe business in an independent shoe store in Cleveland, or elsewhere, after the expiration of the lease; that nowhere in said lease is there any agreement by the lessees to sell the lessees' stock of merchandise to the Lindner Company; and that nowhere in said lease is there any agreement that the Lindner Company has the right to take over the lessees' employees at the expiration of the lease.

It is therefore urged by counsel for defendants that the provision of the lease above quoted, granting to the lessor the exclusive privilege and right for Cleveland and Cuyahoga county to use the trade-mark "Myrod," is void and unenforceable, because an agreement to license the use of the trade-mark

"Myrod" was an agreement to license the use of the naked trade-mark unaccompanied by the sale and the good will and business in which the mark was established.

It is essential that we ascertain the nature and meaning of a trade-mark.

In *Cigar-Makers' Protective Union* v. *Conhaim,* 40 Minn., 243, at page 245, 41 N. W., 943, 944, 3 L. R. A., 125, 12 Am. St. Rep., 726, in explicit language, the court said:

"A trade-mark consists of a word, mark, or device adopted by a manufacturer or vendor to distinguish his productions from other productions of the same article. *Hostetter* v. *Fries,* [C. C.], 17 F., 620. The theory on which the right to it as property is based, is that a man may have acquired a reputation for excellence in the manufacture or preparation of a certain article for sale, which reputation may be the source of profit to him. In the enjoyment of this reputation, and of the benefit and pecuniary advantages thereof, he ought to be protected as he ought to be and is in the advantages of the good-will of a business established by him; and so that the purchasing public may know the origin of such articles when offered for sale, and that they are of his manufacture or preparation, he may adopt and place on them, as the index of their origin, some device or symbol not used by others upon similar articles, which by such adoption and by use in connection with his articles, comes to be known as representing that the articles on which they are placed are made or prepared by him, just as his signature to a business paper is an assurance to others that he executed it. It has, indeed, been likened to his business autograph."

In Nims on Unfair Competition and Trade-Marks (3d Ed.), 510, the author states:

"Selectors as well as makers of goods may use a trade-mark. A person may use a trade-mark to indicate his ability to pick out goods, although all his goods are made by others. Automobiles have been sold under trade-marks by concerns that manufacture practically nothing connected with them. A shoe dealer may sell under his own brand shoes that are made entirely by another. These sometimes are known as 'private brands.' He who uses such a brand becomes sponsor for the goods marked with the brand. Such a person may enjoin another from the use of his mark quite as fully as if he actually manufactures the goods he sells."

The author cites many authorities supporting the proposition laid down in the text.

*Nelson* v. *J. H. Winchell & Co.*, 203 Mass., 75, 89 N. E., 180, 183, 23 L. R. A. (N. S.), 1150, holds:

"The use of a trade-mark does not necessarily and as matter of law import that the articles upon which it is used are manufactured by its user. It may be enough that they are manufactured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style."

In *Menendez* v. *Holt*, 128 U. S., 514, at page 520, 9 S. Ct., 143, 144, 32 L. Ed., 526, speaking of a trademark on flour not manufactured by the owner of the mark, the Supreme Court said:

"It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a cer-

tain degree of excellence. It * * * evidenced, that the skill, knowledge and judgment of Holt & Co. had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite * * * by their selection. * * * And the fact that flour so marked acquired an extensive sale, because the public had discovered that it might be relied on as of a uniformly meritorious quality, demonstrates that the brand deserves protection rather than that it should be debarred therefrom, on the ground, as argued, of being indicative of quality only.''

*In re Australian Wine Importers, Ltd.*, 41 L. R., Ch. Div., 278, likewise supports the proposition laid down in the text at page 511, as follows:

''In a case involving a trade-mark for spirits sold by a wine and spirit merchant, Kay, J., held that a trade-mark 'indicates the goods to be his goods—either goods manufactured by him or goods selected by him, or goods which, in some way or other, pass through his hands in the course of trade.' ''

These authorities, above cited, clearly settle the proposition that trade-marks may be adopted by selectors of merchandise as well as by manufacturers, and that property rights may be acquired in connection therewith by such selectors.

We are of the opinion that the record admits of no dispute that the trade-mark ''Myrod'' was created by Thomas W. Meredith in 1914, and was by him applied to shoes which he sold in his business from 1916 to 1926, which business was conducted by him in the space leased from the Lindner Company, and that all shoes sold in said business during said period were selected and purchased, created and de-

signed by Meredith and his employees, and that the Lindner Company never, in any manner, supervised the selection, designing or purchase of said shoes. The record is also clear that on or about January 1, 1926, Thomas W. Meredith transferred said business and all of its assets to the Myrod Shoe Company, a corporation, and granted to it the exclusive right to continue the use of said trade-mark in the business so long as it should be engaged in a retail shoe business in Cleveland, Ohio.

The record admits of no dispute that from January 1, 1926, until August 31, 1930, the Myrod Shoe Company, through its president, Meredith, and its vice president and general manager, Bender, selected, purchased, and in a sense designed and created all shoes sold by it in said business, without the aid or supervision of the Lindner Company; that all shoes sold by the Myrod Shoe Company during that period were stamped with the trade-mark "Myrod," either on the sole or in the sock lining.

It is also clear from the record that all shoes sold in that business under that name were sold to the various customers by employees hired and paid for by Meredith and the Myrod Shoe Company, and, likewise, that all advertising for the sale of said shoes in said business was paid for by Meredith and the Myrod Shoe Company.

Under this evidence it is clear to us, in view of the authorities above cited, that Meredith and the Myrod Shoe Company established the trade-mark "Myrod" in connection with the shoe business, and that they acquired a property right in said trademark, and became the owners of whatever good will may have been created by its use.

In view of the clear and convincing evidence that the Lindner Company acquired no interest in the business of the Myrod Shoe Company, nor in its good will connected therewith, we are confronted with an important question of law:

Is a transfer of a trade-mark, or a license for the use thereof, unaccompanied by a transfer of the good will and business in connection with which the mark has been established, a valid and enforceable transfer?

Our perusal of the authorities leads us to the conclusion that such a transfer is void and unenforceable.

"A trade-mark or name cannot be assigned except in connection with an assignment of the particular business in which it has been used, with its goodwill, and for continued use upon the same article or class of articles, which it was first applied to, and used upon, by its original adopter, as otherwise the use by the assignee would be false and deceptive. There is no such thing as a right in gross to any particular name or mark. * * * Trade-marks cannot be assigned in gross. An attempted assignment of a naked trade-mark disconnected from any business or good-will is void." 38 Cyc., 867.

"Normally a trade-mark cannot be transferred except with the business of which it is the outward sign. 'A trade-mark cannot be assigned, or its use licensed, except as incidental to a transfer of the business or property in connection with which it has been used. An assignment or license without such a transfer is totally inconsistent with the theory upon which the value of a trade-mark depends and its appropriation by an individual is permitted. The essential value of

a trade-mark is that it identifies to the trade the merchandise upon which it appears as of a certain origin, or as the property of a certain person. * * * Disassociated from merchandise to which it properly appertains, it lacks the essential characteristics which alone give it value, and becomes a false and deceitful designation. It is not by itself such property as may be transferred.' * * *

"The rule governing attempts to license trademarks rests on the nature and function of trademarks. A trade-mark indicates but one source of goods. If it represents more than one source it is not a trade-mark. Its function is to indicate the source of the merchandise on which it appears in terms of the individuality of that source. The owner of a mark may place it on goods he does not manufacture. It is enough if he makes them his own by becoming sponsor for them. Trade-mark owners sell manufactured goods under marks which they own, yet they own no factories, and employ no workmen. The mark indicates to the public an article for which its owner is responsible. It is a guarantee of commercial source, not of manufacturing source.

"This being the nature of marks of trade, all use of such marks by lease, license or grant are unnatural uses, confusing to the public, and all contracts of lease, license or grant are contrary to public policy unless the transfer is accompanied by a transfer of the business itself." Nims on the Law of Unfair Competition and Trade-Marks (3d Ed.), 1929, page 66.

The author cites a long line of authorities supporting the statements of law contained in the text: *Lea* v. *New Home Sewing Machine Co.*, (C. C.), 139 F.,

732; *Falk* v. *American-West Indies Trading Co.*, 180 N. Y., 445, 73 N. E., 239, 1 L. R. A. (N. S.), 704, 105 Am. St. Rep., 778, 2 Ann. Cas., 216; *Detroit Creamery Co.* v. *Velvet Brand Ice Cream Co.*, 187 Mich., 312, 153 N. W., 664.

Counsel for the plaintiff argue that, while the doctrine enunciated by the authorities may be sound, it has no application to the facts of this case. The claim is made that the good will and the business in connection with which the trade-mark was used and established have at all times belonged to the Lindner Company, by reason of the terms of the lease, and that therefore a license for the use of the trade-mark need not be accompanied by the transfer of the good will and business.

A study of the terms of the lease leads us to the definite conclusion that the same did not operate as a transfer of the good will of the business of the lessee to the lessor, at the termination of the lease. In the lease the lessee was at no time restricted from engaging in the shoe business in Cleveland or elsewhere upon the expiration of said lease, nor is there any provision in the lease whereby the lessee bound itself to transfer or sell its good will and business to the lessor at the expiration of said lease or at any time. The lease clearly does not contemplate that the lessee be required to sell or transfer to the lessor any of the stock of merchandise which the lessee may have on hand at the expiration of the lease, or that it be required to transfer or sell any other property used by it in the operation of its business. Quite the contrary appears from the terms of the lease. It contemplates quite clearly that the lessee may re-

move its business to other quarters and continue it there.

The provision in the lease that the fixtures which were jointly owned by the lessor and the lessee should be purchased by the lessee or the lessor, whichever should be the highest bidder, seems to indicate that it was contemplated by the parties that the lessee was to continue in business elsewhere if the lease was not renewed.

We are of the opinion that the lease, either by its express terms or by implication, cannot be construed to operate as a transfer of the business and good will of the Myrod Shoe Company upon the expiration of the lease.

Counsel for the Lindner Company seem to concede that knowledge of the public as to the originator or owner of the trade-mark is immaterial, and that the Myrod Shoe Company has the title to and is the owner of the trade-mark, and seem to agree that the authorities support the foregoing statement of the law.

It is claimed, however, by counsel for the Lindner Company, that the basis and reason for the rule is that to permit the assignment or license of a trade-mark separate from the business in which it has been used would enable a deception to be practiced on the public, and that in this case the Lindner Company's connection with the good will and shoe business, which was conducted for many years, so far as the public is concerned, as a department of its store, was such as to preclude any deception of the public, and that therefore the rule is not applicable to the situation presented by the facts in this case.

As we understand it, the application of the rule

does not depend upon whether, in view of the public's knowledge or lack of knowledge, it will be deceived; or, in other words, whether the public will be deceived under the facts. So far as deception is concerned, the important thing to know is whether the truth is represented by the use of the trade-mark.

If the designation "Myrod" represented anything at all, it was merely that the shoes were selected by the Myrod Shoe Company, and to permit the Lindner Company, which did not take over the business or good will of the Myrod Shoe Company, to sell a selection made by it as the "Myrod" selection, would be untruthful and tend to deceive the public.

During the life of the lease the selections were made by a representative of the Myrod Shoe Company, and they were therefore the selections of the Myrod Shoe Company. The Lindner Company had no voice in or control over such selection.

The fact that the Lindner Company purposes to make the selections by the same person who made such selections as the representative of the Myrod Shoe Company, during the life of the lease, does not, in our opinion, take the present case out of the general rule of law above stated.

We conclude, therefore, that the point raised by the defense, to the effect that the provision of the lease for the transfer of the trade-mark "Myrod" was invalid and unenforceable, is, under the authorities, well taken, and that therefore plaintiff has failed to establish its right or title to the use of said trade-mark.

We direct our attention now to the second important defense, namely, that under the terms of the lease it was contemplated that the lessee was to grant

to the lessor the exclusive right to use such trade-mark in such form as is customary in the granting of rights in the use of trade-marks, and that the lessee not having as yet made such transfer in the customary way, as provided in the lease, the action for injunction is prematurely brought.

It is urged that in order to invest itself with a property right in said trade-mark, so as to give it the basis for asking injunctive relief from a court of equity, the lessor must first resort to an action for specific performance, asking the court to compel the lessee to invest it with title to said trade-mark; that until such step is taken no title or right exists in the lessor to said trade-mark so as to lay a basis for the injunctive relief which it is now seeking.

Counsel for the plaintiff reply to this contention that the prayer for injunction is broad enough to enable a court of equity to do all that is necessary under the facts and circumstances of this case; that while the specific prayer is for injunction, the relief sought is in the nature of broad equitable relief, which includes an order for specific performance, if the court finds the same necessary before granting the injunctive relief, which is the main relief asked.

We are of the opinion that the view set forth by plaintiff relative to this point is entirely sound, and that this petition may be construed to be broad enough to enable the court of equity to grant such relief as is necessary, and that the court may treat this suit for injunction as an action for specific performance.

We are, however, confronted by great difficulty.

It seems to us to be the settled law that when a specific result may be accomplished either by an in-

junction enjoining the breach of a contract, or by an action to compel specific performance of a contract, and the injunction action is brought, it is subject to all defenses that would have been available had the desired result been sought by a specific performance action; that both actions are governed by the same doctrines and rules.

If the terms of a contract are too indefinite and uncertain to be specifically enforced, the court will refuse the injunction suit.

In the case at bar, the contract provides that the license should be granted ''in such form as is customary, for the granting of rights in the use of trademarks.'' There is no showing in the record as to what is customary under such circumstances. It is not unreasonable to suppose that in the form customarily used in the granting of the exclusive use of a trade-mark on a royalty basis, provision is made that the trade-mark will not be used so as to destroy its value.

It seems to us that the agreement of the parties is therefore incomplete, that a court of equity would be bound to refuse an order of specific performance upon such a contract, and that for the same reason no injunction can be granted when it seeks to accomplish the same result.

In Pomeroy's Equity Jurisprudence (2d Ed.), vol. 5, Section 2186, we find the following statement of the law:

''A contract that is incomplete, uncertain or indefinite in its material terms will not be specifically enforced in equity. There is required a greater degree of certainty and definiteness for specific performance than to obtain damages at law. For spe-

cific performance is demanded that degree of certainty and definiteness which leaves in the mind of the chancellor or court no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is to compel done. The element of completeness denotes that the contract embraces all the material terms; that of certainty denotes that each one of these terms is expressed in a sufficiently exact and definite manner. An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted. An uncertain contract is one which may indeed embrace all the material terms, but one or more of them is expressed in so inexact, indefinite, or obscure language, that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect.''

There is a grave question in our minds as to whether parol evidence would be admissible bearing upon the point as to what is the customary form. The parties chose to reduce their agreement to writing, and for the court at a later time to allow either party to supplement the agreement by parol evidence seems to us at least of doubtful sanction. The record fails to disclose any parol evidence bearing upon the point as to what is the customary form for the granting of rights in the use of trade-marks.

As the record now stands, the provision of the lease dealing with the transfer of the trade-mark is so incomplete as to make the equitable relief, either by way of specific performance, or by way of injunction, well-nigh impossible.

The court could not do complete justice between the parties without specific knowledge as to what the

customary form for the transfer of such trade-marks usually consists of, and it therefore would be unable to invest the Lindner Company with the right and title to the trade-mark without at the same time affording to the Myrod Shoe Company and Meredith protective measures, if such are customarily found in the usual form for such transfers.

In so far as the answer of Meredith and the Myrod Shoe Company attacks the good faith of the Lindner Company, we are of the opinion that this point is not sustained by the record. The conduct of the plaintiff complained of by defendants, though subject to criticism, is not in our opinion such conduct as would bar plaintiff's claim to equitable relief, if it were found that the plaintiff company had a title, interest, and right to the trade-mark in question.

In view of our holding that the clause of the lease is of no validity whatsoever, and that it transfers no right or interest to the Lindner Company in said trade-mark, it follows that the prayer of the cross-petition of Meredith and the Myrod Shoe Company, asking that the Lindner Company be restrained from using said trade-mark, must be granted, and it is accordingly so allowed.

For the reasons above stated it is ordered that the prayer of the plaintiff, asking for an injunction against Meredith and the Myrod Shoe Company, be denied, and that the prayer of Meredith and the Myrod Shoe Company, in the cross-petition for an injunction against the Lindner Company, be granted, and a journal entry may be drawn accordingly.

*Decree accordingly.*

VICKERY, P. J., and WASHBURN, J., of the Ninth Appellate District sitting by designation, concur.